CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 05 2010

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| FRED LEWIS WILSON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Case No. 7:08CV00638** |
| | ) |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| | ) |
| SGT. B. COLLINS, ET AL., | ) **By: Glen E. Conrad** |
| | ) **United States District Judge** |
| **Defendants.** | ) |

Plaintiff Fred Lewis Wilson, a Virginia inmate proceeding pro se, brings this action as a civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28 U.S.C. § 1343. In his complaint, Wilson alleges that the defendants, prison officials and medical staff at Wallens Ridge State Prison, violated his constitutional rights in various ways. Defendants have filed motions for summary judgment, and Wilson responded. Upon review of the record, the court finds defendants' motions for summary judgment must be granted in part and denied in part.

## I

### A. Plaintiff's Claims

In his complaint, Wilson sets out thirteen paragraphs that he entitles as "claims." Many of these claims do not include dates or details.[1] To provide additional factual support, Wilson attaches to the complaint, and has submitted throughout the course of the litigation, other supporting documents: informal complaint forms, grievance forms, copies of correspondence,

---

[1] Several weeks after the initial complaint, Wilson filed a motion to amend, stating additional details about his claims against defendants Thompson, Hylton, and Boyd; naming new defendants, LPN Melissa Spears, RN Patsy Garnett Zeppa, and RN Patricia Hileman (referred to in Wilson's submissions as "Hillman"); and adding new claims regarding denial of medical treatment. (No. 17 on the court's electronic docket (hereinafter Dkt. No. 17).) The court construed these allegations as adding subparts and details to his existing complaint as herein designated.

pages from medical records, and descriptions of events occurring during his incarceration. Liberally construing his submissions, he alleges the following claims for relief:

1.  On November 3, 2007, Officer Durham beat plaintiff in the face after Officers Williams and Bishop took plaintiff from a wheelchair, while he was handcuffed and shackled, and slammed his head into the ground.

2.  Lt. Kilbourne and Sgt. King stood and watched the November 3, 2007 beating without intervening.

3.  Lt. Kilbourne refused to allow a nurse to offer plaintiff treatment after the alleged assault on November 3, 2007, although plaintiff informed the nurse that he had something in his eye, and Sgt. King had plaintiff placed in a cell without a mattress for 24 hours.

4.  Following the alleged assault on November 3, 2007, Officers Hylton and Boyd failed to provide plaintiff with access to medical care, although plaintiff stated repeatedly that he had debris in his eye and the eye was swollen shut and runny with "pus"; these defendants also falsified records about the extent of plaintiff's "visible injuries."

5.  On November 4, 2007, Sgt. Collins told plaintiff that he could receive medical treatment and a mattress to sleep on if he made a written apology to her.

6.  After the alleged assault on November 3, 2007, (a) Nurses Zeppa, Spears, and Hileman failed to treat plaintiff's eye after he told them it had something in it; (b) Nurse Spears falsified records about the extent of plaintiff's injuries; (c) Nurse Spears and Nurse Zeppa failed to examine and treat his nasal passageways, although there was blood in his mustache; (d) Nurse Zeppa failed to give plaintiff any medical treatment until he signed an apology to Sgt. Collins; (e) Dr. Thompson refused to examine or treat plaintiff's nasal passageways; and (f) Dr. Thompson and others delayed setting appointments for plaintiff to see the eye doctor, despite plaintiff's complaints of infection and vision loss.[2]

---

[2] In the initial complaint, Claim 6 raised a general complaint about treatment of Wilson's injured eye after the November 3, 2007 incident. The court later granted Wilson's motion to amend to particularize his allegations. (See Dkt. No. 17.)

7.  Officer Hylton denied plaintiff a mattress on November 3, 2007, although the Qualified Mental Health Professional (QMHP) had approved the mattress for his use.

8.  While escorting plaintiff back to his housing unit on January 9, 2008, Officers Tabor and Roberts assaulted plaintiff.

9.  Dr. Thompson and Nurse Stanford ignored plaintiff's requests (a) for examination and specialized treatment of his left hand, despite plaintiff's reports that it did not function properly after repeated injuries to the fingers of that hand; and (b) these defendants also failed to provide treatment of sores on plaintiff's scalp, starting in August 2007.

10. On September 22, 2008, at 3:20 p.m., Sgt. J. Ely slammed plaintiff's head against a door jamb, injuring his left ear. Ely then whispered to plaintiff, "Remember what this feels like?" and dislocated plaintiff's left pinky finger with his hand.

11. Dr. Thompson observed plaintiff's injured finger and cut ear on September 23, 2008, advised that he had prescribed pain medication and ordered X-rays for the next day and that he would treat the finger then, but plaintiff did not receive treatment or pain medication and had to reset his own finger.

12. After an object became embedded in his heel, Nurse Stanford replied to his requests for treatment, but did not provide treatment.

13. On November 28, 2008, plaintiff still suffered adverse effects because Dr. Thompson and Nurse Stanford failed to ensure that he received adequate treatment for his (a) fingers, (b) scalp, or (c) foot.[3]

---

[3] In this claim, Wilson also alleges generally that he suffered a two-year delay in receiving dental treatment for a missing filling and "possible gum disease." Court records reflect that he raised much more specific versions of these claims in another, later-filed civil rights action, Case No. 7:09CV00325; the case was summarily dismissed for failure to state a claim and is currently on appeal. Therefore, the court will dismiss the dental claims from this action without prejudice to avoid duplicative litigation.

## B. Procedural History

In response to Wilson's complaint as amended, Defendants Stanford, Thompson, Hileman, Spears, and Zeppa (the medical defendants) filed motions for summary judgment as to the merits of the claims against them regarding Wilson's medical treatment. These medical defendants have responded only as to the claims in which they are named: Claims 6, 9, and 11-13. The remaining defendants—Bishop, Boyd, Collins, Durham, Ely, Hylton, Kilbourne, King, Roberts, Tabor, and Williams (the security defendants), who are represented by separate counsel, filed a motion for summary judgment, arguing that all but one claim raised against any of these defendants must be dismissed because Wilson failed to properly exhaust administrative remedies before filing this action, as required pursuant to 42 U.S.C. § 1997e(a).[4] Wilson has responded to all of the motions.

## II

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Rule 56( c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

---

[4] These security defendants have responded only to the claims raised against them–Claims 1-5, 7-8, and 10.

A verified complaint or other submissions filed by a pro se prisoner are to be considered as affidavits and may defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979). Although the court must view the evidence in the light most favorable to the nonmovant, the court "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) (quotation omitted).

## A. Incident on November 3, 2007

## (Claims 1-7)

### 1. Wilson's Allegations

Wilson's submissions include several verified accounts of this incident, each offering slightly different details. In summary, he alleges the following sequence of events.[5] On Saturday evening, November 3, 2007, Sgt. Collins and other officers removed Wilson from his cell in shackles and handcuffs and searched the cell. Among his personal property items, they discovered a note that they interpreted as a suicide letter and noted fresh blood on the walls of the cell. They informed Wilson that he would be taken to the medical unit to be maintained on suicide watch and then placed him in a wheelchair for transport to medical. On the way across the recreation yard, Sgt. Collins verbally harassed Wilson and he "cuss[ed]" at her and spat twice.[6] The officers removed him from the chair and placed him on the ground, slammed his

---

[5] See, e.g., Dkt. No. 1, pp. 1-4, 135-140; Dkt. No. 17. In executing these statements, as well as his responses to defendants' motions for summary judgment, Wilson states that he is telling the truth from his personal knowledge and can prove his allegations. Given his pro se status, the court liberally construes all of these pleadings as verified in substantial compliance with 28 U.S.C. § 1746. See Williams, 952 F.2d at 823.

[6] Wilson claims that he spat on the ground, but the officers charged him with spitting on Sgt. Collins. She later asked Wilson to consent to a blood test so that he could be tested for blood borne diseases, and he complied with this request.

face into the ground several times, kicked him, and jerked him around using the restraints, while making verbal threats. In the scuffle, debris became lodged in Wilson's right eye.

Officers then pulled Wilson up off the ground, using his fingers and the restraints, and carried him in that manner across the recreation yard to the medical unit. On the way, an officer jabbed a finger in Wilson's right eye. In the medical unit, officers placed the inmate in a stripped cell under suicide watch with officers checking on him every fifteen minutes throughout the night; he had no mattress and was allowed only a wet smock to wear.[7]

When he first arrived in the unit about 7:00 p.m., Wilson told Nurse Spears and Nurse Zeppa that he needed treatment and that he had something "cutting into" his eye. His eyes were already swollen from the "beating," he had cuts above and below his left eye, and he had scrapes on his body.[8] Nurse Spears directed him to open his eyes, but he could not. Spears noted in the medical records that Wilson had no "visible injuries." The nurses did not provide any treatment and left him in a medical observation cell all night. Sgt. Collins informed the nurses that after the suicide note was found in Wilson's cell, he informed her that the blood on the walls of his cell had come from a nosebleed. Yet, based on this knowledge, Nurse Spears and Zeppa did not check his nasal passageways for injury. Nurse Zeppa, who worked the night shift, did not reevaluate him during the night.[9] Officers Hylton and Boyd, who performed the 15-minute

---

[7] Wilson alleges that this smock had been soaked in toilet water and that the officers continued to verbally harass and threaten him.

[8] Wilson attaches a photocopy of a notarized statement by another inmate, Michael Copson, who states that he observed these injuries when Wilson was brought into the medical unit on November 3, 2007. Wilson also submits photocopies of photographs of himself, purportedly taken on November 7, 2007, in which his face appears bruised around his eyes and cheek bones and several abrasions are visible on his back and shoulders.

[9] Wilson first raises this allegation in his response to Nurse Zeppa's motion for summary judgment. Therefore, the defendant has not responded to this allegation. As an exhibit to Dkt. No. 72, Wilson submits portions of a statement that Nurse Zeppa apparently gave to prison investigators after the November 3, 2007 incident, in which she states:

> As soon as we made it into medical Wilson started shouting Help me!, Help me!. It was like he went from being the vill[ai]n to the victim. Nurse Spears assisted me in checking him in the infirm[ary] It was me, Spears, Wilson, and at least two other officers. Spears was checking Wilson. I went to do something else. The officers put Wilson in one of the medical cells. When we were back in with Wilson, Wilson complained that there

checks on Wilson's cell, "falsified" facts when they reported in various documents that Wilson had "no visible injuries" after the altercation on November 3, 2007, and ignored his continued requests for medical treatment during the night. Wilson also claims that Hylton and Boyd must have seen his right eye swelling during the night, but did not ensure that he received medical treatment before morning and, instead, laughed and threatened him.

On the morning of November 4, 2007, the officers' reports and the medical records noted observations that Wilson's eyes had swollen shut. Nurse Hileman assessed him, but did not do anything for his right eye, even though he told her he could not see and felt like something was in the eye. She provided him with Motrin. That evening, Sgt. Collins came to Wilson's cell and told him that if he would write out an apology to her about the incident the day before, he would not receive disciplinary charges and would receive medical treatment, a shower, a clean smock, and a mattress. Officers brought him paper and pen, and he wrote the apology. Then, Nurse Zeppa examined Wilson's eyes, consulted with a doctor by telephone, and thereafter, flushed out Wilson's eyes with eye wash and tested his vision. Wilson was provided with a mattress later that night, but did not receive a shower or clean smock for several days. Later in the week, officers served him with three disciplinary charges related to the November 3, 2007 incident in the recreation yard.

## 2. Exhaustion of Administrative Remedies (Claims 1-5 and 7)

As stated, the security defendants argue that Wilson failed to properly exhaust administrative remedies as to the claims against them related to the November 3, 2007 incident

---

was something wrong with his eyes. Spears told Wilson to open his eyes. Wilson had his head clinched over and refused to cooperate with Spears. Spears said there was nothing wrong with Wilson's eyes. Later we heard that there was blood in Wilson's cell. Spears went back to check Wilson. When she came back, she said that there was nothing wrong with him.

I didn't see Wilson any more that night. Wilson didn't have any further medical requests that evening as far as I know.

On 11/4/07 I saw Wilson at 7:35 p.m. I flushed Wilson's eye. His eyeball was in good shape.

(Dkt. No. 72, Exhibit A.)

(Claims 1-5 and 7). The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It is well established that the exhaustion requirement is mandatory, <u>Anderson v. XYZ Correctional Health Services, Inc.</u>, 407 F.3d 674, 677 (4th Cir. 2005), and that the requirement "applies to all inmate suits about prison life." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." <u>Woodford v. Ngo</u>, 548 U.S. 81, 90 (2006). Failure to file on time, according to the agency's deadlines, is not "proper exhaustion." <u>Id.</u> An inmate's failure to exhaust is an affirmative defense and the burden is on the defendant to prove the failure to exhaust. <u>See Jones v. Bock</u>, 549 U.S. 199, 216 (2007).

The security defendants attach to their motion for summary judgment a copy of Virginia Department of Corrections (VDOC) Division Operating Procedure (DOP) 866.1, the grievance procedure available to Wilson at Wallens Ridge in November 2007, along with an affidavit from B. Ravizee, Grievance Coordinator, concerning Wilson's utilization of the grievance procedures. Each inmate is oriented to use of the grievance procedures soon after his arrival at a VDOC prison. An aggrieved inmate must follow three distinct steps to exhaust the procedure's remedies. First, he must make a good faith effort to resolve the issue informally, by pursuing an informal complaint to the appropriate department head, who should respond within 15 days. If the inmate is not satisfied with the response to the informal complaint, he may file a regular grievance within 30 days from the occurrence or incident or from the discovery of the occurrence or incident, whichever date is later. The inmate must attach the informal complaint to his regular grievance form or explain in the regular grievance text his informal attempts to resolve the problem. If the regular grievance meets intake requirements, the grievance coordinator will log it for processing and send the inmate a receipt. If the grievance does not meet intake criteria for acceptance, the grievance coordinator will return it to the inmate within two working days of

receipt, noting on the back the reason for the return and explaining how the inmate may correct the deficiency. A copy of all refused grievances is made and maintained by the VDOC. As explained at the bottom of each regular grievance form, an inmate may seek review of the intake decision by sending the refused grievance to the Regional Ombudsman for a determination within five calendar days. There is no further review of the intake decision.

DOP 866 provides for three levels of review for regular grievances, although most complaints qualify for only two levels of review. At Level I, the warden or superintendent answers the regular grievance, normally within thirty days. An inmate unsatisfied with the Level I response may appeal to Level II; at this level, the Regional Director, Health Services Director, or Chief of Operations for Classification and Records, depending on the nature of the claim raised, will respond within twenty days. Grievances concerning medical care go to the Health Services Director at Level II. Id. Expiration of the time limit without issuance of a staff response at any stage of the remedies procedure qualifies the grievance for appeal to the next level. An emergency grievance does not qualify as a regular grievance, and its denial cannot be appealed.

Based on her review of Wilson's grievance file, Ravizee states that on September 11, 2007, Wilson signed an acknowledgment of formal orientation, indicating that officers had explained the VDOC grievance procedures to him, with an opportunity for him to ask any questions. (Dkt. 46, Ravizee Affid. ¶ 9 and Encl. B.) Between November 29 and January 8, 2008, Wilson filed numerous regular grievances about the alleged assault on November 3, 2007 and denial of medical treatment. These grievances were rejected, however, because Wilson failed to provide specific information, filed outside prescribed time limits, or failed to attach evidence of his use of the informal procedure. Because he did not utilize the available remedies procedures properly, defendants argue that he failed to comply with § 1997e(a) and that Claims 1-5 and 7 must therefore be dismissed.

Wilson filed three timely informal complaints related to the November 3, 2007

incident—two on November 12 and one on November 16, 2007.[10]  (Dkt. No. 55, pp. 7, 10-11.)

Officials responded to these complaints on November 28, 2007, indicating that the November 3,

2007 incident had been turned over to the special investigations unit.  Wilson then had six days

to file a regular grievance about the incident.  He alleges that officers provided him with only one

grievance form during that period.  On November 29, 2007, he filed a regular grievance that

stated simply, "I want criminal charges filed against all officers involved in the inhumane beating

I re[ceived] on 11-3-07 around 7:00 p.m. in A-Rec yard!" (Dkt. No. 55, p. 8.)  Ravizee rejected

the grievance and returned it to Wilson on December 3, 2007, indicating that he had provided

insufficient information; her response stated, "Clarify your issue – file criminal charges to the

magistrate in Wise, Va.  Address your issue regarding officers on complaint & grievance form –

be specific."  Although this form included an explanation about the opportunity to appeal this

intake decision within five days to the Regional Ombudsman, Wilson offers no evidence that he

followed this appeal procedure.

On December 11, 2007, Wilson filed a more detailed regular grievance about the

incident:

> I want criminal charges filed against all officers involved in the inhuman beating I
> rec[ei]ved on 11-3-07 around 7:00 pm in A-Rec. yard.  I was taken to the ground
> from a wheelchair handcuffed from behind and legs shackled my head slam[m]ed
> multiple times into the ground dirt gravels kicked into my eyes and my right side
> of my face beat in by Officer Durham other officers there I know of are Sgt.
> Collins, Sgt. King, Lt. Kilbourne, Bishop, Williams.
>
> Sorry the five day limit has been exceeded I have not been given any grievance
> forms I've asked for till today when my lawyer came to see me!

---

[10]  The informal complaint forms filed on November 12, 2007 alleged that: (1) before the
November 3 incident, officers had threatened Wilson's life and called him a child molester; (2) after the
November 3 incident, officers threatened his life; (3) someone told Wilson that he would "die on this
mountain"; and (4) on November 4, 2007, while in a suicide strip cell, officers made Wilson write an
apology for a spitting incident in exchange for getting medical treatment, clean clothes, and a mattress,
and avoiding disciplinary charges and future beatings.  The informal complaint filed on November 16,
2007, concerned Wilson's desire to bring criminal charges against "all officers involved in the inhumane
treatment [he] received on 11-3-07."

(Dkt. No. 46, Attach. 6, p. 3.) (emphasis in original). Ravizee rejected this grievance as untimely. Wilson offers no evidence that he utilized the option explained on the form to appeal this intake decision within five days to the Regional Ombudsman, to explain why he was unable to file a timely grievance about the November 3, 2007 incident.

Instead, Wilson filed other complaint forms and grievances, which were ruled repetitive or untimely filed. He tried to explain in these later submissions that he was not given his property for a month after the November 3, 2007 incident and did not have a copy of the inmate handbook.[11] He also complains that the injuries he received on November 3, 2007 hampered his ability to obtain and prepare complaint forms and grievances. He alleges that all of his grievances, even the untimely ones, were sent to the "highest levels and beyond to Dept. of Justice and president." His exhibits include letters to the governor and attorney general of Virginia.

Wilson presents no evidence, however, on which he could convince a fact finder that he followed the inmate grievance procedures regarding his complaints about the alleged misdeeds of the security defendants in connection with the November 3, 2007 incident. He does not dispute defendants' evidence that he received a verbal explanation of the procedures in September 2007 and signed a form so indicating. In addition, the informal complaint form itself includes a printed paragraph of directions on how to file an informal complaint and attach it to a regular grievance. Clearly, as evidenced by the complaint forms Wilson filed, he did have a pen and complaint forms within the thirty-day period after the November 3, 2007 incident, and was able to write, despite his injuries. Nevertheless, he chose not to submit a timely complaint form describing the alleged assault on November 3, 2007 or security officials' alleged interference with his attempts to obtain medical treatment thereafter. He also had a regular grievance form within the appropriate time period, as evidenced by the one he filed on November 29, 2007. He

---

[11] Wilson also complains that from November 3-12, 2007, he did not have a pen in his cell and was not given any informal complaint forms.

chose to use this form to seek criminal action against the officers, rather than to file a grievance specifically describing their actions on November 3, 2007.

Furthermore, when his regular grievances filed in early December 2007, that did describe the officers' actions as required, were rejected as untimely filed, Wilson failed to comply with the procedure described at the bottom of each grievance form, allowing him to appeal the intake decision by mailing the grievance within five days to the Regional Ombudsman.[12] Wilson attempted other avenues by which to have his untimely grievances considered, such as mailing them to the governor's office. However, he does not submit evidence demonstrating that he complied with the procedures available within the times prescribed by those procedures, as required to satisfy the exhaustion requirement of § 1997e(a).[13] Ngo, 548 U.S. at 90. Accordingly, the court concludes that defendants are entitled to summary judgment as to Claims 1, 2, 3, 4, 5, and 7, regarding the incident on November 3, 2007, based on Wilson's failure to properly exhaust administrative remedies, and these claims will be dismissed without prejudice, pursuant to § 1997e(a).

### 3. No Deliberate Indifference to Serious Medical Needs (Claim 6)

In their motions for summary judgment, the medical defendants do not present the affirmative defense that Wilson failed to exhaust administrative remedies as to the claims against them. Rather, they argue that they were not deliberately indifferent to any serious medical needs that resulted from Wilson's altercation with corrections officers on November 3, 2007.

The United States Supreme Court has held that punishments or prison conditions are "repugnant to the Eighth Amendment" if they "are incompatible with the evolving standards of

---

[12] Wilson submits a letter to the Regional Ombudsman, dated January 13, 2008, offering his reasons for being "unable" to file timely grievances about the November 3, 2007 incident. Clearly, this letter, written two months after the incident, fell outside the five-day appeal period for the grievances Wilson filed in early December 2007.

[13] Wilson asserts that he could not have filed grievances about the issue in Claim 7 within thirty days of the incident, because he did not receive documentation until much later, and so did not know that the QMHP had approved a mattress for his use on November 3, 2007. This argument fails. The constitutional violation here, if there is one, relates to denial of the mattress, and Wilson certainly knew that fact in time to file a timely complaint form and grievance.

decency that mark the progress of a maturing society . . . or . . . involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotations omitted). To prove that medical treatment he received while a prisoner amounted to a constitutional violation, an inmate must show that personnel to whose care he was committed exhibited "deliberate indifference" to his "serious medical needs." Id. at 104-105. Inadvertent failure to provide treatment, negligent diagnosis, and medical malpractice do not present constitutional deprivations. Id. at 105-106.

First, the prisoner must demonstrate a medical need serious enough to give rise to a constitutional claim. "[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotations omitted); Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious). Second, plaintiff must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he drew or must have drawn that inference, and that he consciously disregarded the risk. Farmer v. Brennan, 511 U.S. 825, 837-39 (1994).

**a. Debris in Plaintiff's Eye (Claims 6(a), (d) and (f))**

In support of their motions for summary judgment, the medical defendants offer their affidavits and copies of Wilson's medical records as evidence of the evaluation and treatment he received from medical staff after the November 3, 2007 altercation with security officers. (Dkt. Nos. 51 and 66.) When officers brought Wilson to the medical unit about 7:05 p.m., Nurse Spears evaluated his condition and noted Wilson's complaint that his hands, eyes, and left knee were "messed up." At that time, she noted no swelling and indicated that Wilson had mobility in his knee and hands. She noted that his eyes were shut, and although she repeatedly asked him to

- 13 -

open them so she could assess them, he did not open his eyes.[14] Her notes indicate that she did not observe any cuts, bruises, or blood around his eye. She denies that Wilson complained specifically of having debris in his eye. After her assessment of Wilson's condition, Spears' shift ended, and the incoming nurse placed Wilson in medical observation.[15]

Nurse Hileman examined Wilson on the morning of November 4, 2007. She noted that the inmate asked for something for pain. She noted her observation of some dried blood on his left eye, with two small scratches nearby, and indicated that his right eye was swollen shut with bruising around it.[16] Hileman prescribed Motrin and treated the scratches.[17] She noted that Wilson complained of being unable to see out of his right eye, but did not note any complaint that he had debris in the eye. Hileman noted later in the day that Wilson had chosen not to wash his face and eyes.[18]

Nurse Zeppa's medical notes from 7:35 p.m on November 4, 2007 indicated Wilson's complaint that he was unable to see from his right eye and observed that it was red, with bruising and some discharge. She called the doctor, who ordered that Wilson have his eyes flushed with

---

[14] Wilson claims that he could not open his eyes without using his hands, which were in handcuffs at the time of the examination.

[15] Wilson's exhibits include notes from the QMHP who consulted with security officers on November 3, 2007 about the suicide note found in Wilson's cell and recommended that Wilson be housed in a "modified strip cell" until a QMHP could assess his condition. (Dkt. No. 1, pp. 50-54.)

[16] In her affidavit, Nurse Hileman states:
I recall discussing with Nurse Spears my concern that when Nurse Spears evaluated plaintiff on the night of November 3 she did not observe the cuts, bruises, or blood around [Wilson's] eyes that I observed the following morning. Along with other members of the medical staff I suspected plaintiff of self-inflicting injuries to his eyes.
(Dkt. 51, Exhibit C.) She also states that according to the medical notes, when Dr. Thompson evaluated plaintiff [on January 14, 2008], he noted a concern that plaintiff's bi-lateral ecchymosis (black eyes) was self-inflicted and referred plaintiff for a psychological evaluation "as patient is manipulating physical ailments."
(Id.)

[17] At 8:25 a.m. on November 3, 2007, Nurse Hileman also noted that Wilson had red marks on both wrists, a red area on his right little finger, a red swollen area on top of his left foot, and three areas of scratches on his right hip.

[18] Wilson contends that he remained on suicide watch on November 4, 2007, was not provided with soap, wash cloth, or towel, and had no access to water, because the water to the sink and toilet in his cell were turned off.

eye wash, prescribed eye drops for ten days, and ordered her to check Wilson's vision using an eye chart. When Nurse Zeppa asked Wilson to read the eye chart in the medical unit, his vision in the left eye was 20/40 and with the right eye, he read only the first line. The nurse flushed his eyes and noted no irritation to the eye, but observed "edema to surrounding tissue." She also applied the eye drops as prescribed. Other nurses' notes from November 5 and 6, 2007 indicate that Wilson did not voice any specific complaints, that he had dark rings around both eyes, that the right eye was swollen, and that drainage was noticeable from the right eye. The nurses continued to apply the eye drops as prescribed. Nurse Hileman next saw Wilson on November 7, 2007, when she noted that both of his eyes were black, but that not as much swelling was present.

Dr. Thompson examined Wilson's right eye on November 7, 2007, and noted that Wilson denied any change or decrease in his vision.[19] On November 12, 2007, among other things, Dr. Thompson reexamined Wilson's eyes, noting that Wilson now claimed that his vision from his right eye was blurry. On November 29, 2007, in response to Wilson's request to see the eye doctor, Nurse Stanford responded that he was on the schedule, but that eye exams were done only two days per month. On December 6, 2007, the eye doctor, Dr. Compton examined Wilson's eyes and prescribed additional medications. Dr. Thompson saw Wilson on December 11, 2007, noting that the inmate claimed his vision was better.[20]

Dr. Thompson next examined Wilson's eyes on January 14, 2008, after Wilson's involvement in another altercation with corrections officers. The doctor noted no ocular injury and prescribed eye medication, to be followed by a consultation with an optometrist.

In response to defendants' evidence, Wilson states that he next saw the eye doctor on February 28, 2008, when the doctor diagnosed an eye infection and prescribed two different

---

[19]  Wilson claims that he asked to be referred to an eye specialist.

[20]  Wilson claims that he told Dr. Thompson the eye was feeling better, but his vision had not changed.  (Dkt. 36, p. 2.)

kinds of eye drops.[21]  Wilson reported that one of the medications was stolen in early March, but medical staff did not offer to replace it.  He suffered with the infection for a while longer until "it cleared itself up."  He feels that he had to suffer needlessly with chronic pain from the eye infections and that he has had some vision loss.

Clearly, Wilson disagrees with some aspects of the course of treatment defendants provided for the eye problems he began to exhibit after the November 3, 2007 incident.  Wilson asserts that the pain of having debris in his eye overnight, the ongoing pain of the eye infection he developed thereafter, and the vision loss qualify as serious medical needs, and that the defendants were deliberately indifferent to each of these needs.  The court cannot agree.  Taking the evidence in the light most favorable to Wilson, the court finds that he fails to establish the elements of any constitutional claim concerning his eye problems.

Even assuming that Wilson told Nurse Spears and Nurse Zeppa on the evening of November 3, 2007, that he had something in his eyes, as he alleges, he admits that he did not comply with Nurse Spears' request that he open his eye to allow her to assess the problem.  Moreover, the record indicates that once Wilson was inside the medical observation cell, his hands were not shackled.  Therefore, the nurses and officers could reasonably have assumed that with free use of his hands, he himself could remove the debris from his eye to lessen his pain and discomfort.  Nurse Spears assessed his condition as well as she could, given his failure to open his eyes as requested, and from the outside, as she noted, she saw nothing wrong with his eyes.[22]

---

[21]  In another submission, Wilson states that he saw the eye specialist, Dr. Kline, on March 3, 2008, was diagnosed with an eye infection, and received two prescriptions for eye drops.  He also states that this doctor diagnosed him with "presbyopia." (Dkt. 1, p. 4.)  "Presbyopia" is defined as "farsightedness due to ciliary muscle weakness and loss of elasticity in the crystalline lens." "presbyopia." Dictionary.com Unabridged. Random House, Inc. 16 Feb. 2010. <Dictionary.com http://dictionary.reference.com/browse/presbyopia>.

[22]  Based on the injuries noted by Nurse Hileman on the morning of November 4, 2007 and the injuries as photographed on November 7, 2007, Wilson complains that Nurse Spears and Nurse Zeppa must also have seen cuts and bruises on his face when he first arrived at the medical unit on November 3, 2007.  His evidence does not create a genuine issue of material fact here, however.  First, Wilson himself did not see how his injuries appeared on November 3, 2007, as by his own allegations, his eyes were closed.  Second, the notarized statement by inmate Michael Copson reporting his perception of Wilson's injuries on the night of November 3, 2007, is not verified; Copson did not state that, under penalty of

As her shift was ending, she reasonably could have believed that if Wilson needed further treatment during the night, he would communicate that need to the night shift nurse. Wilson presents Nurse Zeppa's statement that after Nurse Spears told her nothing was wrong with Wilson's eyes, Nurse Zeppa did not see Wilson again during the night or receive any notice during that time, indicating that he was asking for, or needed, medical treatment of any kind. (Dkt. No. 72, p. 4.)

Nurse Hileman, observing Wilson's facial bruises and cuts the next morning, could reasonably have believed that this trauma was the cause for Wilson's eye trouble and that treating the cuts and providing Motrin for pain would, over time, lessen any discomfort with his eyes as well. Her failure to investigate whether there was also debris in his eye as another, separate cause of discomfort represents, at most, medical negligence, which is not actionable under § 1983. Estelle, 429 U.S. at 105-06. Wilson does not allege that he communicated any requests to Nurse Hileman later in the day that she provide further medical attention for his eye.

That evening, at 7:35 p.m., Nurse Zeppa noted Wilson's complaints about his eye and observed his condition; at 8:15 p.m, she noted that she consulted a doctor, provided treatment for Wilson's eye complaints, and tested his vision. Wilson's allegations regarding the timing of events–that she gave the treatment only after he had signed an apology to Sgt. Collins– does not support a reasonable inference that Zeppa deliberately withheld treatment until he wrote the apology.[23] As a night shift nurse, she had only recently come on duty when she noted Wilson's eye complaints and provided treatment. Moreover, she expressly states in her affidavit that she

---

perjury, he was telling the truth. Williams, 952 F.2d at 823; 28 U.S.C. § 1746. Accordingly, Copson's statement is not sufficient to create a genuine issue of fact in the face of defendants' evidence indicating that they did not observe any cuts or bruises on Wilson's face on November 3, 2007. Finally, in his complaint as amended, Wilson does not raise a specific claim against these defendants for failing to treat his cuts and bruises on November 3, 2008; Claim 6 complains only about their failure to provide care for his eye that had debris in it.

[23] Wilson does not allege any facts in support of his bald assertion in his submissions that all the medical defendants withheld treatment after the November 3, 2007 incident, because he had not apologized to Sgt. Collins. In fact, Nurse Hileman did provide treatment on the morning of November 4, 2008, before the alleged apology.

did not withhold treatment. (Dkt. No. 66, Ex. B.) Thus, the court finds no material fact in dispute as to whether any of the nurses knew of and ignored a serious medical need for different treatment of Wilson's eye in the first 24 hours after the assault.

Furthermore, the record demonstrates that the nurses and Dr. Thompson monitored Wilson's eye condition in the days and weeks that followed. Wilson received eye drops, saw the doctor several times, and was examined by an eye doctor at least twice in four months. While the eye infection allegedly caused him pain and lingered or recurred, despite the treatment he received, it ultimately cleared up on its own. Wilson offers no evidence on which he could prove the source of the infection or that it constituted a serious medical need requiring different or more prompt treatment than the defendant nurses and doctor provided. He also offers no evidence on which a reasonable fact finder could determine that any vision change he may have experienced between November 2007 to November 2008, resulted from the course of treatment he received for his eyes at Wallens Ridge. The court concludes that the defendants are entitled to summary judgment as to Claims 6(a), (d) and (f).

**b. Accuracy of Medical Notes (Claim 6(b))**

Wilson's claim that the nurses falsified their notes about his medical condition on November 3, 2007 fails under § 1983. The notes themselves are neither a medical need nor a treatment provided. Hence, whether or not the notes accurately depicted the injuries that Wilson presented that evening has no relevance to his claim under Estelle if no one relied on the notes to determine that no treatment was necessary. 429 U.S. at 102. Nurses Spears and Zeppa both observed Wilson's injuries when he entered the medical unit and made their treatment decisions based on that initial assessment, not their own notes about what they saw.[24] Later in her shift,

---

[24] On the other hand, Nurse Spears' medical notes from 7:05 p.m. on November 3, 2007, do reflect the reasons for her decision not to provide any specific treatment for Wilson at that time: her observations of no edema, redness or open areas on his hands, his ability to move both hands without difficulty, her observation of no edema on the left knee and his ability to move without difficulty, and his failure to open his eyes for assessment. Her final note indicated "No visible injuries noted [at] this time," and stated an intention to obtain lab tests for HIV and Hepatitis.

Nurse Zeppa also relied on Nurse Spears' verbal statement to her that nothing was wrong with Wilson's eyes, and as the evening passed, relied on the fact that no further medical complaint from Wilson was communicated to her.

Wilson presents no evidence that Nurse Hileman relied on Nurse Spears' or Nurse Zeppa's notes from the night before in determining, in her medical judgment, what treatment was warranted by Wilson's condition as she observed it in the morning. Similarly, Nurse Zeppa's decision to treat the eye later that evening was based on her observations, not the allegedly "falsified" medical notes of which Wilson complains. Therefore, the court finds no material fact in dispute as to whether the nurses' medical notes caused Wilson any harm and will therefore grant summary judgment for the defendants as to Claim 6(b).

### c. Nasal Passageways (Claim 6(c) and (e))

As discussed, Wilson told Sgt. Collins on November 3, 2007 that the blood on his cell walls had come from a nosebleed, and she relayed this information to the nurses. Based on this information and the presence of blood in his mustache, Wilson asserts that Nurses Zeppa and Spears and Dr. Thompson should have examined his nasal passageways for injury. Yet, Wilson alleges no facts and presents no evidence whatsoever to suggest that any condition in that area of his body presented a serious medical need for treatment of which any of the defendants was aware. In fact, the medical records indicate that other than swelling and bruising, Wilson suffered no injury to his nose on November 3, 2007.[25] As Wilson fails to demonstrate either a serious medical need or deliberate indifference related to the condition of his nasal passageways, this claim fails under Estelle, 429 U.S. at 102. The court finds no material fact in dispute and will grant summary judgment for the defendants as to Claims 6(c) and 6(e).

---

[25] Defendants' evidence includes a radiological interpretation report, dated November 7, 2007, indicating that an X-ray of Wilson's maxillofacial region indicated that the facial bones appeared intact with no fractures seen. (Dkt. No. 21, Ex. A, p. 16.) The report's conclusion states: "bilateral periorbital soft tissue swelling." (Id.)

## B. Incident on January 9, 2008

## (Claim 8)

In this claim, Wilson sues Officers Tabor and Roberts for allegedly assaulting him on January 9, 2008. Defendants admit that Wilson properly exhausted administrative remedies as to this claim.[26] They assert that they are entitled to summary judgment on the ground of qualified immunity.

### 1. Plaintiff's Allegations

Wilson alleges the following sequence of events in a statement attached to his verified complaint. On January 9, 2008, officers took Wilson from his cell for a visit with his mother. Officers Tabor and Roberts "held him back from going [and] said [he] had to share." They also criticized his appearance and called him names. Wilson used profanity and called them liars. The officers commented that "the state should put trash like [Wilson] to death." After the visit, Tabor and Roberts escorted Wilson back to his cell, while verbally taunting him with comments about his mother. A passing officer commented that Wilson was a good artist. Roberts asked Wilson if he was "a right or lefty," and Wilson answered that he was left-handed. The officers continued their verbal taunting, and Wilson responded with profanity. They threatened to "kick his ass." Wilson called them cowards. Roberts then told Wilson that they would take him to an area that had no surveillance cameras and "beat [him] good."

After the officers and Wilson entered A-Building, Roberts tripped Wilson, slammed him to the concrete, and kicked him in the left temple and in the ribs on his left side. Tabor gave Wilson a "knee chop" on the right side of his back and slammed the inmate's head into the

---

[26] B. Ravizee states that on January 30, 2008, Wilson filed a grievance, #630-14049, complaining that on January 9, 2008, officers Tabor and Roberts had threatened and beaten him and that Officer Roberts dislocated two fingers on Wilson's left hand. After an extension issued in February 2008, the warden responded to the grievance on March 21, 2008, stating that the matter was being investigated. By the time the warden responded, the response time had expired, so the grievance was returned to Wilson, unanswered, so that he could appeal to the next level. Wilson did so. On May 13, 2008, Regional Director Larry Huffman held that the grievance was unfounded, based on the decision of the special investigations unit that the allegation of assault was unfounded. Ravizee states that these proceedings constituted exhaustion of the available grievance remedies at Wallens Ridge.

concrete. Roberts took two fingers of Wilson's left hand, saying that it would be awhile before he did any more art, and bent both fingers back to the wrist. Wilson asserts that he is still unable to use his left hand as well as he did before this incident.

## 2. Defendants' Evidence

In support of their motion for summary judgment, Defendants Tabor and Roberts offer their affidavits. (Dkt. No. 46, Attach. 4 & 5.) Tabor states that on the way back from the visit on January 9, 2008, Wilson became verbally abusive, particularly towards Roberts, and was cursing him and using profanity. Tabor ordered Wilson to stop the cursing. Wilson spat on the ground. Tabor told him that spitting on the ground was okay. Wilson then used profanity again and spat on Tabor's arm.[27] At that point, both officers moved to "gain control over" Wilson by placing him on the ground, with Wilson fighting both of them during the process. Tabor states that Wilson was rolled over onto his belly after the takedown to prevent further assaults. Wilson was in waist chain and handcuffs, as is the standard procedure for visits. After another officer arrived to assist Roberts in escorting Wilson back to his cell, Tabor went to clean himself of Wilson's spit. Tabor states that he did not see Roberts kicking Wilson at any time or see Roberts bending Wilson's fingers out of socket. Tabor asserts that he acted professionally and did not make any comments about Wilson's visitors.

Roberts' affidavit corroborates Tabor's version of events on January 9, 2008. He states that he made no inappropriate comments about Wilson or his visitors, that he did not kick Wilson, and that he did not bend Wilson's left fingers out of socket. Wilson was charged and convicted of the disciplinary infraction of spitting/throwing bodily waste/fluids on another person.

Evidence in the record indicates that Nurse Stanford evaluated Wilson's condition about 4:00 p.m. on January 9, 2008, in the medical unit. She noted several abrasions, swelling of his

---

[27] Wilson admits that he used profanity, but denies that he spat on either of the officers on January 9, 2008. (Dkt. No. 55, p. 5.)

right foot, and dislocations of his third and fourth fingers on his left hand. Dr. Thompson then examined Wilson's injuries, put his dislocated fingers back into place without difficulty, and splinted them. He ordered that the splint be removed on January 10 and then to have the fingers "buddy taped" and prescribed Motrin. On January 11 and 14, 2008, Dr. Thompson reevaluated Wilsons' fingers, and indicated that they were doing well.

### 3. Applicable Law

Defendants Tabor and Roberts argue that they are entitled to qualified immunity against Wilson's claims. The doctrine of qualified immunity protects government officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When a government official properly asserts the defense of qualified immunity, he is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established such that it would not have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 205 (2001)).

When resolution of the qualified immunity question and the case itself both depend upon a determination of what actually happened, summary judgment on grounds of qualified immunity is not proper. Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995). Accordingly, the district court should not grant summary judgment where "there remains any material factual dispute regarding the actual conduct of the defendants." Id.

It is well established that

> [F]or an inmate to prove an excessive force claim, he must satisfy not only the subjective component that the correctional officers acted with a sufficiently culpable state of mind, but also the objective component that his alleged injury was sufficiently serious in relation to the need for force to establish constitutionally excessive force.

Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (citations omitted). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency [and the Eighth Amendment] always are violated." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotations omitted) (finding Eighth Amendment claim where evidence showed that prison guards punched inmate repeatedly in response to verbal argument, loosening his teeth, inflicting minor bruises and swelling of his face, and a cracked partial dental plate). On the other hand, use of force "in a good faith effort to maintain or restore discipline" does not establish constitutionally excessive force. Stanley, 134 F.3d at 634 (4th Cir. 1998) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). To determine the subjective element of an excessive force claim, the court considers such factors as the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

In considering the objective element of an excessive force claim, the court must evaluate "the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." Stanley, 134 F.3d at 634. No constitutional issue arises where an officer's use of force was de minimis; thus, de minimis injury can be conclusive evidence that the use of force was not objectively harmful enough to be unconstitutional. Norman v. Taylor, 25 F.3d 1259, 1262, 1263 (4th Cir. 1994) ("[A]bsent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is de minimis.").

> [I]n determining whether injuries are de minimis, we generally consider the following: the context in which the injuries were sustained; whether the inmate sought medical care; whether the injuries were documented in medical records; and whether the documented injuries are consistent with the application of the amount of force necessary under the particular circumstances.

Williams v. Collier, No. 08-6759, 2009 WL 2171236, *2 (4th Cir. July 22, 2009) (citing Taylor v. McDuffie, 155 F.3d 479, 484-85 (4th Cir. 1998). "[W]hen a prisoner is held and calmly

beaten by two guards in response to a verbal argument, the de minimis level is more easily reached." Stanley, 134 F.3d at 634.

### 4. Qualified Immunity Discussion

Applying these principles to Wilson's allegations about the altercation on January 9, 2008, and taking the facts in the light most favorable to him, the court concludes that defendants are not entitled to summary judgment on the ground of qualified immunity. Wilson's allegations that Tabor and Roberts, in the context of a verbal dispute, purposely took him out of camera range to beat him and bend his fingers out of socket, satisfy the subjective element of an Eighth Amendment claim of excessive force. Id. Two dislocated fingers that required medical treatment, inflicted in a setting where plaintiff's only undisputed misdeeds were verbal, satisfy the objective element of the claim. Id. Thus, if Wilson can prove his version of events, he states an actionable, constitutional claim under the Eighth Amendment. Id. Moreover, he meets one of the two prongs of the qualified immunity analysis. Henry, 501 F.3d at 377.

Defendants deny purposely harming Wilson and state that in a good faith effort to restore order, they used an amount and type of force that was reasonable in response to Wilson's defiant behavior and his act of spitting on Tabor. They deny purposely injuring Wilson and assert that he must have incurred his injuries by accident in the course of their reasonable efforts to bring him under control, using appropriate take down procedures. Defendants argue that a reasonable officer in such a situation would not have known that he was violating the inmate's constitutional rights and, therefore, assert that they are entitled to summary judgment on the ground of qualified immunity. The court finds genuine issues of material fact in dispute, however, as to Wilson's conduct and defendants' conduct on January 9, 2008. Therefore, summary judgment on the ground of qualified immunity is not appropriate. Buonocore, 65 F.3d at 359. The court will deny defendants' motion for summary judgment as to Claim 8.

## C. Incident on September 22, 2008

## (Claims 10, 11, and 13)

### 1. Exhaustion of Excessive Force Claim (Claim 10)

In Claim 10, Wilson alleges that Sgt. Ely purposely slammed Wilson's head into a door jamb, causing a cut to his ear, and then used his hand to purposely dislocate Wilson's pinky finger. These allegations, taken in the light most favorable to Wilson, state an actionable constitutional claim of excessive force. Stanley, 134 F.3d at 634.

Defendant Ely relies on the affidavit from Grievance Coordinator Ravizee in arguing that Claim 10 should be dismissed, because Wilson failed to exhaust administrative remedies as to this incident. Ravizee states that according to her records, Wilson did not file any regular grievances about Ely's alleged actions on September 22, 2008. Because he missed this key step in the available administrative remedies procedure, Ely argues, Wilson did not comply with the exhaustion requirement of § 1997e(a) before filing this action.

Wilson alleges that for two months after the September 22, 2008 incident, first at Wallens Ridge and then after his transfer to Red Onion, he was housed in a stripped cell and was not given any informal complaint forms at all. Although DOP 866 provides that "each offender will be entitled to use the grievance procedure," DOP 866(IV)(D)(1), the policy does not provide a specific method by which to ensure that inmates in strip cell status have appropriate access to grievance forms. Furthermore, in their affidavits, defendants do not discuss Wilson's access to such forms during the month following the September 22, 2008 incident.

A prison's administrative remedy procedure is not "available" for purposes of § 1997e(a) if prison officials "exploit the exhaustion requirement by not responding to grievances . . . . [or prevent] an inmate access to an administrative remedy," such as by failing to provide him with the necessary remedy forms. Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004) (citations omitted). The court finds a genuine issue of material fact as to whether Wilson was prevented from complying with the grievance procedures as to Claim 10—by his housing assignment

and/or by prison officials' failure to provide him proper forms. Accordingly, as to Claim 10, defendants' motion for summary judgment on grounds of nonexhaustion will be denied.

### 2. Medical Treatment (Claim 11 and 13(a))

In Claim 11 of his initial complaint, Wilson alleges that on September 23, 2008, after examining the cut ear and dislocated finger Wilson allegedly suffered during the September 22, 2008 altercation with Sgt. Ely, Dr. Thompson promised to provide pain medication, an X-ray, and other treatment, but failed to ensure that the prescribed treatment was actually provided to Wilson. Because of the delay in treatment, Wilson alleges, he was forced to reset his own finger, which is still deformed.[28] Among the many exhibits submitted with the initial complaint, Wilson includes copies of two requests for medical service, both dated September 25, 2008. (Dkt. No. 1, pp. 81-82.) One request asked "Marsha" (Nurse Stanford) to have someone reset Wilson's pinky finger and check a cut on his ear that needed stitches; Nurse Stanford's September 27, 2008 response stated: "You address me as Nurse Stanford you will be seen." (Id. at 81.) In the other request, Wilson asked "Marsha" to tell Dr. Thompson to reset the pinky finger, that Wilson had not received an X-ray or other promised treatment, including medication for pain, that his ear needed stitches and was still oozing blood, that he was in "great pain," and that he would reset his finger himself if he did not get help soon; Nurse Stanford's September 27, 2008 response stated: "The institutional physician determines if there is a need for a consultation or not." (Id. at

---

[28] In his verified response to defendants' motion for summary judgment (Dkt. No. 32.), Wilson provides additional allegations: that he told Dr. Thompson he was in pain and his dislocated finger needed to be reset; that Dr. Thompson asked why Wilson would want him to reset the finger, since Wilson thought Dr. Thompson had done a bad job resetting his other dislocated fingers in January 2008; that Dr. Thompson "refused" to treat "a deep cut into the cart[ilage] of [his] left ear which ble[d for] many days" and caused a scar; that Wilson, from his experience working in a funeral home, knew the ear needed stitches; that he told Dr. Thompson about problems he was also having with sores on his scalp and an object embedded in his heel; that the doctor just walked off; that no treatment was provided; and that on September 26, 2008, Wilson reset his own left pinky finger and suffered "extreme discomfort and pain."

When Wilson filed his response (Dkt. No. 32), he asked the court to serve the pleading on the defendants. Due to a misunderstanding of his request at the time of filing, however, the pleading and its attachments were docketed as duplicate paperwork, and the paper originals were maintained as such in the clerk's office, rather than being entered on the court's electronic docket. This inadvertent error will be corrected on the electronic docket, such that all of Wilson's submissions will be available for viewing.

82.) In Claim 13(a) of the initial complaint, Wilson also complains that Nurse Stanford and Dr. Thompson failed to ensure that he received treatment for his fingers before his transfer to Red Onion in November 2008.

Defendants offer affidavits and medical records as evidence in response to this claim. A nurse's note on September 23, 2008 indicates that Wilson was examined on that date, after his release from five-point restraints at about 9:00 a.m. He complained at first that he could not bend his left pinky finger, which appeared slightly swollen and discolored. The nurse noted, however, that while he was talking to her, he did bend the pinky finger. Later that day, Dr. Thompson met with Wilson, who was complaining that his left pinky finger had been "pulled back." The doctor noted that the finger showed "no gross deformity" and ordered an X-ray, which was scheduled for September 25, 2008. On September 23, 2008, Dr. Thompson also noted that Wilson's hygiene was poor, but that he agreed to shower. On September 25, 2008, a nurse noted that Wilson "[r]efused l[eft] hand X-rays." The next nurse's note on Wilson's chart, dated November 20, 2008, indicated that he would be transferred to Red Onion the next day.[29]

Wilson does not complain about Thompson's decision on September 23, 2008 to wait to treat the injured finger until after the X-ray results were available. Rather, he alleges that although Dr. Thompson determined that the X-ray, pain medication, and treatment for the cut on his ear were necessary, the doctor failed to provide such treatment.[30] Wilson also complains that

---

[29] In his verified response to defendants' evidence, Wilson insists that he did not refuse an X-ray on September 25, 2008, and expresses doubt that an X-ray was even ordered. (Dkt. No. 32.) He also states that after resetting his finger, "it was useless to file any more sick call requests as I was not going to be seen." (Id.)

[30] Wilson also alleges telling Dr. Thompson on September 23, 2008 about his scalp sores and heel problem. However, he does not mention that the doctor promised on that day to treat these conditions, indicating a medical judgment that no treatment was necessary at that time. Questions of medical judgment are not subject to judicial review. Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975).
    Furthermore, Wilson did not mention these conditions in the medical treatment requests he submitted to Nurse Stanford on September 25, 2008 or at any time thereafter. Accordingly, the court finds no claim that these defendants knew of a serious medical need for treatment of these conditions between September 23 and November 20, 2008, when Wilson was transferred to Red Onion. The court will address separately Wilson's allegations that these defendants ignored his scalp sores and heel problem on earlier occasions.

after he advised Nurse Stanford that these medical needs, which the doctor had recognized, were ongoing as of September 25, 2008, she failed to schedule him for evaluation. The defendants' evidence does not offer any explanation for the fact that even though the doctor had seen fit to order an X-ray on September 23, he provided no follow up evaluation or treatment, and Nurse Stanford took no steps to schedule Wilson for further evaluation and treatment after he expressly requested it on September 25, 2008. The court concludes that based on his verified complaint and exhibits attached thereto, Williams, 952 F.2d at 823, Wilson has presented genuine issues of material fact as to whether Dr. Thompson and Nurse Stanford knew Wilson had serious medical needs for pain medication and treatment of his ear and for further evaluation of his injured finger, but disregarded the risks of harm presented by these needs so as to constitute deliberate indifference. Farmer, 511 U.S. at 837. Accordingly, the court will deny defendants' motion for summary judgment as to Claim 11 and 13(a) against Nurse Stanford and Dr. Thompson regarding their alleged failure to treat Wilson's cut ear and problems with the fingers of his left hand after the September 22, 2008 incident.

### D. Other Medical Claims
### (Claims 9, 12, 13(b), and 13(c))

### 1. Injured Fingers (Claims 9(a))

Wilson alleges in Claim 9(a) that after the November 3, 2007 and the January 9, 2008 altercations with officers, he could no longer make a fist with his left hand. When he asked Dr. Thompson and Nurse Stanford for assessment and treatment of this long-term problem, however, he was "completely ignored." Specifically, Wilson alleges that the residual effects of the injuries to his fingers are painful, have "greatly [a]ffected [his] writing skills and [caused him] significant disability to perform simple daily activities as well as pursuing [his] career as a master painter/artist/musician and renovation specialist once released from prison." He faults Dr.

Thompson and Nurse Stanford for failing to send him to a specialist for examination of his left hand as he requested.[31]

According to defendants' evidence, Dr. Thompson evaluated Wilson on November 7, 2007, for several complaints, including pain in the fifth finger of his left hand. The doctor ordered X-rays of the hand and Wilson's knee, performed that same day. The X-ray of the hand was normal and showed no acute fractures. Dr. Thompson discussed the negative X-ray results with Wilson immediately and at his next visit on November 12, 2007. On December 5, 2007, Wilson complained to Dr. Thompson that his right thumb was numb. The doctor noted that Wilson was able to use the thumb to hold the paper and that the thumb was flexible. On December 11, 2007, Dr. Thompson again examined Wilson's thumb, noting that the inmate did not complain about numbness there until three weeks after the November 3, 2007 incident and that Wilson appeared to have normal function in the thumb. The doctor performed a follow up examination on the thumb on December 17, 2007.

After Wilson's altercation with officers on January 9, 2008, Dr. Thompson diagnosed him as having two dislocated fingers on his left hand. The doctor put the dislocated fingers back in place without complication and splinted them. He ordered that the splint be removed on January 10, 2008, and that the fingers be "buddy taped." Dr. Thompson reevaluated the fingers on January 11 and 14, 2008, and noted that they were doing well. On February 26, 2008, X-rays of Wilson's left hand revealed no acute fractures.

The record clearly reflects that Dr. Thompson did not ignore Wilson's complaints about his finger injuries between November 2007 and September 22, 2008. The doctor assessed Wilson's finger function several times and based his treatment decisions on his clinical observations of the fingers themselves, Wilson's ability to use the injured fingers, and the

---

[31] Among the exhibits to the initial complaint, Wilson includes two requests for medical services, addressed to Nurse Stanford in August 2008. (Dkt. 1, pp. 76 and 80.) In each of these requests, Wilson complained that Dr. Thompson had ignored his requests to have his left hand examined by a specialist, because he was having trouble using it, which would affect his careers in music and art. To this question, Nurse Stanford responded that the institutional physician determines if an off site consultation is needed.

February 26, 2008 X-ray, which showed no fractures. The court cannot question Dr. Thompson's medical judgment that the condition of Wilson's left hand did not require referral to a specialist during this period, and if that judgment constituted medical negligence, such a claim is not actionable under § 1983. Estelle, 429 U.S. at 105-06. Nurse Stanford rightfully relied on the doctor's medical judgment as to whether the appropriate course of treatment for Wilson's fingers included referral to a specialist. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990). Finding no genuine issue of material fact in dispute, the court concludes that defendants' motion for summary judgment must be granted as to Claim 9(a) regarding treatment of Wilson's finger injuries between January 3, 2007 and September 22, 2008.[32]

### 2. Scalp Condition (Claims 9(b) and 13(b))

In Claims 9(b) and 13(b), Wilson also alleges that Dr. Thompson and Nurse Stanford failed to provide adequate treatment for sores on Wilson's scalp, which caused him to suffer with the condition for over a year. Wilson points to a note in the medical intake record, indicating that when Wilson was received as an inmate at Wallens Ridge on September 12, 2007, Dr. Thompson noted the presence of "scalp dermatitis," as well as similar sores on Wilson's back and arms, and prescribed a medical cream for the condition.[33] (Dkt. No. 54, p. 2.) Wilson claims that he never received this medication,[34] that he continued to suffer from the sores, that he continued to make verbal and written requests to have the condition assessed, and that he complained about the condition to Dr. Thompson whenever the doctor made his rounds or assessed Wilson for other problems.

---

[32] As discussed, the court will deny summary judgment as to Claim 13(a), alleging that these defendants failed to treat Wilson's finger injuries from September 23 to November 20, 2008.

[33] Wilson also alleges that the sores evident on his back and shoulders in the pictures taken of him on November 7, 2007 after the November 3 altercation in the recreation yard are the same type of sores that he had on his scalp in 2007-2008. (Dkt. No. 54, p. 5.)

[34] A medication chart for Wilson appears to indicate that the prescription for medical cream prescribed on September 12, 2007 for his rash was discontinued that same day. (Dkt. No. 54, p. 4.)

Defendants offer the following evidence. During the examination on December 12, 2007, Dr. Thompson noted the presence of the scalp sores, questioned whether they might be self-inflicted, and ordered "necessary follow up." (Dkt. No. 21, Ex. D.) The medical records also include a nurse's note on July 29, 2008 that indicated it was difficult to check Wilson's head because of his long hair and unkempt appearance.[35] On July 30, 2008, Wilson showed another nurse a small red "sore" on his forehead, under his hair. Dr. Thompson's notes of a September 23, 2008 visit with Wilson indicate that the inmate had poor hygiene and had agreed to shower.[36] Nurse Stanford states that as the Registered Nurse Health Authority for Wallens Ridge, she was responsible for responding to informal complaints, but had minimal actual contact with Wilson concerning his physical complaints. (Dkt. No. 21, Ex. E.) It is undisputed that Wilson did not file any requests with medical staff between September 25, 2008 and his November 20, 2008 transfer to Red Onion.

Taking the evidence in the light most favorable to Wilson, the court finds no genuine issue of material fact as to deliberate indifference. By Wilson's own allegations, Dr. Thompson observed the scalp condition on several occasions, but on each occasion, made a medical judgment that treatment was not necessary at that time, that the condition should be monitored, and that the inmate needed to improve his personal hygiene. Nurse Stanford could rightfully rely on the doctor's assessment of the need for treatment of the condition, as reflected in her advice to

---

[35] Wilson submits copies of two requests for medical services complaining about his scalp condition, dated August 16, 2008, in which he asserted that he had made verbal requests for treatment of the condition to nurses and to Dr. Thompson numerous times since August 2007, without receiving treatment she had promised. (Dkt. 1, pp. 73, 75.) In her response, Nurse Stanford advised Wilson: "To improve the condition of your skin and scalp – you need to shower each time you are given the chance to do so." Another request form, dated August 21, 2008, demanded that for the sake of his scalp condition, Nurse Stanford should ensure that Wilson received showers more often. (Dkt. 1, p. 78.) She responded that security policy addressed the inmate shower issue and that he should address this concern to the appropriate security officer.

[36] Wilson complains that he was denied showers for lengthy periods while he was at Wallens Ridge, although he does not raise any specific claim for relief on this issue. His submissions reflect, however, that he believed officers should be required to video tape him any time he was escorted from his cell to the shower area, so as to document any use of excessive force against him by the escorting officers, and he would sometimes refuse opportunities for a shower if no video equipment was present.

Wilson that he needed to take more showers, as the doctor had also advised. Miltier, 896 F.2d at 854. Wilson's disagreement with the assessment or treatment decisions of these medical professionals does not support a constitutional claim of deliberate indifference Estelle, 429 U.S. at 105-06. To the extent that he is alleging misdiagnosis of the severity of the condition, he presents nothing more than a claim of medical negligence, which is also not actionable under § 1983. Id. Finally, defendants cannot be held liable for failing to provide treatment between September 24 and November 20, 2008, as they received no requests for treatment during this period. Finding no genuine issue of material fact in dispute as to deliberate indifference with respect to Wilson's scalp condition, the court will grant defendants' motion for summary judgment as to Claims 9(b) and 13(b).

### 3. Foot Problem (Claims 12 and 13(c))

In Claim 12, Wilson states that Nurse Stanford responded to his requests for medical services regarding a piece of glass or some similar object that had become lodged in his heel, but never provided him treatment. In Claim 13(c), he complains that as of November 2008, neither Nurse Stanford nor Dr. Thompson had provided treatment for his foot. In his verified complaint and response to defendants' motion for summary judgment, Wilson does not state the date on which this heel injury occurred or describe any details about its severity or any adverse effects that he suffered as a result of it.[37] He simply alleges that Nurse Stanford knew of the problem from medical requests he filed and that he told Dr. Thompson about the problem when the doctor examined him on September 23, 2008.

---

[37] In the stack of exhibits attached to his complaint, Wilson includes some requests for medical services about this problem, to which Nurse Stanford responded: (1) August 16, 2008 request, stating that he has a piece of glass or some other object embedded in his left heel and complaining for another paragraph that officers have taken his shoes; Nurse Stanford responded, stating that he had not been denied shoes; (2) August 16, 2008 request, asking that the doctor remove the object from his heel, as it has become infected, and then complaining again about being denied shoes; Nurse Stanford responded that he "[had] footwear per DOC policy"; (3) August 21, 2008 request, stating that Wilson had not been provided shoes to wear when walking from his cell to the visitation area for his most recent visit with his mother and asking to have his foot "looked at"; Nurse Stanford replied on August 27, 2008, that Wilson had been scheduled to see the nurse. (Dkt. 1, pp. 74, 77, 79.)

Taking the evidence in the light most favorable to Wilson, the court finds no genuine issue of material fact as to deliberate indifference to a medical need that any of the medical defendants knew presented a serious risk of harm without immediate treatment. Farmer, 511 U.S. at 837. Nurse Stanford reasonably could have believed that Wilson's first two medical requests about this problem were focused on his desire to obtain better shoes. In response to the third request, she advised Wilson on August 27, 2008 that he was scheduled to see a nurse. Wilson does not allege that he notified her at any time thereafter that he had not, in fact, been assessed, that his current symptoms were causing him pain, or even that he still needed treatment. He also does not refute her evidence that given her job assignment, she was not the nurse who he would have been scheduled to see. Similarly, by Wilson's own allegations, he notified Dr. Thompson of the object embedded in his heel, and the doctor made a medical judgment that treatment was not necessary at that time. Wilson's disagreement with the doctor's assessment that the heel problem did not require immediate treatment does not support a constitutional claim of deliberate indifference. Estelle, 429 U.S. at 105-06. To the extent that Wilson is alleging misdiagnosis of the severity of the condition, he presents nothing more than a claim of medical negligence, which is also not actionable under § 1983. Id. Finally, defendants cannot be held liable for failing to provide treatment between September 24 and November 20, 2008, as they received no requests for treatment during this period. Finding no genuine issue of material fact in dispute as to deliberate indifference with respect to Wilson's heel problem, the court will grant defendants' motion for summary judgment as Claims 12 and 13(c).

### III

For the stated reasons, the court concludes that the security defendants' motion for summary judgment must be granted as to Claims 1-5 and 7 (regarding the incident on November 3, 2007) on the ground that Wilson failed to properly exhaust his available administrative remedies as to these claims, as required under § 1997e(a). As to Claim 8 (against Defendants Tabor and Roberts regarding the incident on January 9, 2008), the security defendants' motion

for summary judgment on the ground of qualified immunity must be denied.  As to Claim 10 (against Defendant Ely regarding the incident on September 22, 2008), the security defendants' motion for summary judgment for failure to exhaust must also be denied.  As to Claims 11 and 13(a) (alleging deliberate indifference by Dr. Thompson and Nurse Stanford regarding Wilson's alleged finger and ear injuries in September 2008), the medical defendants' motions for summary judgment must be denied.  Finally, as to Claims 6, 9(a), 9(b), 12, 13(b), and 13(c), the motions for summary judgment submitted by the medical defendants must be granted.  An appropriate order will issue this day.

The clerk will send copies of this memorandum opinion and the accompanying order to plaintiff and to counsel of record for the defendants.

ENTER:  This _5th_ day of ~~February~~ MARCH, 2010.

_(signature)_

United States District Judge